UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| JOE R. WHATLEY, JR., solely in his capacity as the WD Trustee of the WD Trust,<br><br>    Plaintiff<br><br>      v.<br><br>CANADIAN PACIFIC RAILWAY LIMITED, CANADIAN PACIFIC RAILWAY COMPANY,SOO LINE CORPORATION, SOO LINE RAILROAD COMPANY, AND DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION,<br><br>    Defendants. | **COMPLAINT AND JURY TRIAL DEMAND**<br><br>Case No. |

## COMPLAINT

Plaintiff Joe R. Whatley, Jr., solely in his capacity as the WD Trustee of the WD Trust (the "WD Trustee"), by and through his undersigned counsel, brings this Complaint asserting claims against Defendants Canadian Pacific Railway Limited ("CP Limited"), Canadian Pacific Railway Company ("CP"), Soo Line Corporation ("Soo Line Corp."), Soo Line Railroad Company ("Soo Line"), and Dakota, Minnesota & Eastern Railroad Corporation ("DME," and collectively with CP, CP Limited, Soo Line Corp., and Soo Line, the "Defendants"). In support of this Complaint, the WD Trustee avers as follows:

### Parties

1.     The WD Trustee is a resident of Alabama. The WD Trust is a trust formed under Delaware law but sited in Alabama. Montreal Maine & Atlantic Railway, Ltd. ("MMA") filed a voluntary petition for relief under title 11 of the United States Code on August 7, 2013 in the U.S. Bankruptcy Court for the District of Maine (the "Bankruptcy Court"), Case No. 13-10670-

1

PJK (the "Bankruptcy Case").  MMA is a corporation organized and existing under the laws of

the State of Delaware with its principal place of business located in Portland, Maine.  MMA is

the parent company of its wholly-owned Canadian subsidiary, Montreal Maine & Atlantic

Canada Co., a company formed and existing as an unlimited liability company under the laws of

Nova Scotia ("MMAC").  Robert J. Keach, was appointed the chapter 11 trustee pursuant to 11

U.S.C. § 1163 in the Bankruptcy Case (the "Chapter 11 Trustee").  Pursuant to the Chapter 11

Plan of Liquidation Dated as of July 15, 2015 (As Amended on October 8, 2015) [Bankr. D.E.

1822] (the "Plan"), the WD Trust (as defined in the Plan) was established for the benefit of the

WD Trust Beneficiaries (as defined in the Plan) and serves as a mechanism for liquidating

certain assets for the benefit of the WD Trust Beneficiaries and other persons as provided in the

Plan.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

On October 9, 2015, the Bankruptcy Court entered the Order Confirming Trustee's Revised First

Amended Plan of Liquidation Dated July 15, 2015 and Authorizing and Directing Certain

Actions in Connection Therewith [Bankr. D.E. 1801] (the "Confirmation Order").  A copy of the

Confirmation Order is attached hereto as **Exhibit B** and incorporated herein by reference.  The

Chapter 11 Trustee, among others, submitted the Confirmation Order to the U.S. District Court

for the District of Maine (the "Maine District Court") as a recommended decision for review by

an Article III Judge.  On November 18, 2015, the Maine District Court entered an Order

adopting the Confirmation Order.  See Order Adopting Bankruptcy Court Order Confirming

Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015, and Authorizing and

Directing Certain Actions in Connection Therewith, In re Montreal Maine & Atlantic Railway,

Ltd., No. 1:15-mc-329-JDL, D.E. 16 (D. Me. November 18, 2015), a true and correct copy of

which is attached hereto as **Exhibit C** and incorporated herein by reference   The Confirmation

---

[1] The term "Bankr. D.E." refers to the docket number in the Bankruptcy Case.

Order authorized the Chapter 11 Trustee to choose Joe R. Whatley, Jr. to serve as the WD Trustee, and to designate the WD Trust and the WD Trustee to be the assignees of claims arising under 49 U.S.C. § 11706, the Carmack Amendment, which claims had been assigned to the designee of the Chapter 11 Trustee, MMAC, and Richter Advisory Group, Inc., the monitor appointed in MMAC's bankruptcy case (the "Monitor"), under certain Settlement Agreements (as defined in the Plan). The relevant settlement agreements are attached hereto as **Exhibits D and E**, respectively. The Chapter 11 Trustee, MMAC, and the Monitor executed that certain Assignment Agreement assigning their claims under the Carmack Amendment to the WD Trustee and the WD Trust. A copy of the Assignment Agreement is attached hereto as **Exhibit F** and incorporated herein by reference.

2.     Upon information and belief, Defendant CP Limited is a corporation organized and authorized to do business and is doing business in the State of North Dakota, and organized and existing under the laws of Canada, with its principal place of business located Calgary, Alberta, Canada, and with a place of business in Montreal, Quebec, Canada. In North Dakota, CP Limited has a feeder line between Drake and New Town and has two feeder lines in North Dakota and western Minnesota operated by the Dakota Missouri Valley and Western Railroad, and Northern Plains Railroad.

3.     Upon information and belief, Defendant CP is the operating subsidiary of CP Limited and is a fully integrated and technologically advanced Class 1 railway providing rail and intermodal freight transportation services over a 14,400-mile network serving the principal business centers of Canada, from Montreal to Vancouver, British Columbia, and the U.S. Midwest and Northeast regions. Further, upon information and belief, Defendant CP is a wholly owned direct subsidiary of CP Limited, and is also a corporation organized and authorized to do

business and is doing business in the State of North Dakota, and organized and existing under the laws of Canada, with its principal place of business located in Alberta, Canada and with corporate offices in Minneapolis, Minnesota.   See Affidavit of James Clements, <u>Keach v. Canadian Pacific Railway Corp. (In re Montreal Maine & Atlantic Railway, Ltd.)</u>, No. 14-1001, D.E. 140-1 (Bankr. D. Me. June 23, 2015), a true and correct copy of which is attached hereto as **Exhibit G** and incorporated herein by reference.

4.     Upon information and belief, Defendant Soo Line Corp. is a corporation organized and authorized to do business and is doing business in the State of North Dakota, and organized and existing under the laws of the State of Minnesota with its principal place of business located in Minneapolis, Minnesota.   Upon information and belief, Soo Line Corp. is an indirect wholly owned subsidiary of CP.

5.     Upon information and belief, Defendant Soo Line is a Class I railway operating in the U.S. Midwest.   Soo Line is one of the railways through which Defendant CP's network accesses the U.S. market directly and is a corporation organized and authorized to do business and is doing business in the State of North Dakota, and organized and existing under the laws of the State of Minnesota with is principal place of business located in Minneapolis, Minnesota. Upon information and belief, Soo Line is a wholly owned subsidiary of Soo Line Corp.   Upon information and belief, Soo Line was responsible for operating Train 282 (as defined below) between New Town, North Dakota and the point of transfer to CP.

6.     Upon information and belief, Defendant DME is a railway operating across several states in the U.S. Midwest.   DME is one of the railways through which Defendant CP's network accesses the U.S. market directly.   Further, upon information and belief, DME is a corporation organized and authorized to do business and is doing business in the State of North

Dakota, and organized and existing under the laws of Delaware with a principal place of business located in Sioux Falls, South Dakota.   Upon information and belief, DME is a wholly owned subsidiary of Soo Line and an indirect wholly owned subsidiary of Soo Line Corp.

7.      The following chart sets forth CP Limited's principal subsidiaries, including the jurisdiction of incorporation and the percentage of voting and non-voting securities CP Limited owns directly or indirectly:

| Principal Subsidiary | Connection to Defendants | Incorporated under the Laws of | Percentage of Voting Securities Held Directly or Indirectly |
| --- | --- | --- | --- |
| CP | Wholly owned direct subsidiary of CP Limited | Canada | 100% |
| Soo Line Corp. | Indirect wholly owned subsidiary of CP | Minnesota | 100% |
| Soo Line | Wholly owned subsidiary of Soo Line Corp. | Minnesota | 100% |
| DME | Indirect wholly owned subsidiary of Soo Line Corp. | Delaware | 100% |

**Jurisdiction and Venue**

8.      This is an action for damages arising under 49 U.S.C. § 11706, the Carmack Amendment.   Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States.

9.      In the alternative, the damages sought exceed $75,000.   Accordingly, this Court has jurisdiction over this action because of the diversity of citizenship between the WD Trustee and the Defendants, and because the amount in controversy is in excess of $75,000.

10.    The Defendants conduct business in North Dakota and have sufficient contacts with the state of North Dakota and this District such that they are essentially doing business here, and such that an exercise of general personal jurisdiction over them in this Court would be substantially fair.  The Defendants operate rail lines throughout the United States and Canada, including extensive operations in North Dakota (with rail lines and operations in this judicial district).

11.    Venue is proper in this District pursuant to 49 U.S.C. § 11706(d)(2), because the Defendants are the initial, originating, and/or receiving rail carriers, and the shipment at issue originated in New Town, North Dakota.

### Facts

12.    This action involves loss and damage to and arising out of a shipment of crude oil that was produced from the Bakken Formation (the "Cargo") and was moved or intended to be moved from New Town, North Dakota to Saint John, New Brunswick (Canada), as described more fully in the waybill and through bill of lading issued by CP (the "Bill of Lading").

13.    The Bakken Formation is a sub-surface rock formation covering approximately two hundred thousand square miles in the States of Montana and North Dakota, as well as portions of Canada.

14.    Crude oil extracted from the Bakken Formation includes material such as volatile vapors, gases, propane, butane, and natural gasoline.  These vapors, gases, and liquids are often explosive and can self-ignite at low ambient temperatures.

15.    There is no pipeline system to transport crude oil extracted from the Bakken Formation in North Dakota to Eastern oil refineries.   Accordingly, such transportation is accomplished almost entirely by rail.

16.    Crude oil is transported along railways in what are known as tank cars.

6

17.     For more than two decades, one of the most common types of tank cars used to transport hazardous liquids, including crude oil, throughout North America has been the DOT-111 ("DOT-111").   For many years preceding the derailment described below, government safety regulators and the media have documented and reported that DOT-111 tank cars were prone to tear or rupture upon a collision and/or derailment, which could potentially spill their cargo.

18.     Prudent and safe shipping practices dictate that hazardous flammable liquids that are explosive and capable of self-igniting at low ambient temperatures should not be transported in a train including DOT-111 tank cars that do not have reinforced shells, heads shields, valves, and other exposed fittings, unless the train operator is able to implement enhanced safety procedures and protocols to prevent or minimize the risk of derailment.

19.     Prudent and safe shipping practices further dictate that the volatility and flammability of hazardous cargo be properly documented and that every party involved in the extraction, loading, transporting, and refining of crude oil properly document and confirm the volatility and flammability of hazardous cargo.

20.     Prudent and safe shipping practices further dictate that every party involved in the extraction, loading, transporting and refining of highly volatile crude oil insure that enhanced safety procedures and protocols are established and followed to prevent or minimize the risk of derailment.

21.     Prudent and safe shipping practices further dictate that, unless a train's operator is made aware that the train's cargo contains hazardous, flammable liquids that are explosive and capable of self-igniting at low ambient temperatures and is, therefore, able to implement enhanced safety procedures and protocols to prevent or minimize the risk of derailment, such

cargo should not be transported in a train including DOT-111 tank cars that do not have reinforced shells, head shields, valves, and other exposed fittings.

22.     Cargo volatility is an important consideration in determining rail car selection as well as applicable safety procedures and protocols to be implemented with respect to any shipment of hazardous material.

23.     There are nine recognized classes of hazardous substances in the United States and Canada.  These classes define the type of risk a hazardous material may pose.  Crude oil falls within "Hazard Class 3 – Flammable Liquids."

24.     The packing groups applicable to a particular hazard class indicate the degree of risk a hazardous material may pose in transport in relation to other materials within that hazard class.

25.     There are three packing groups applicable to Class 3 Hazardous Materials: Packing Group I, indicating high danger, Packing Group II, indicating moderate danger, and Packing Group III, indicating low danger.

26.     The Cargo was obtained from eleven different suppliers from a number of wells located within the North Dakota Bakken Formation.

27.     On or about June 29, 2013, World Fuel Services Corporation, World Fuel Services, Inc., and Western Petroleum Company (collectively, the "World Fuel Entities") and Irving Oil Ltd. ("Irving") obtained and offered to the Defendants for shipment the Cargo from New Town, North Dakota to Saint John, New Brunswick (Canada).

28.     Irving was the ultimate purchaser of the Cargo.

29.     The shipment of the Cargo was loaded into approximately one buffer car and seventy-two (72) tank cars making up train number 282 ("Train 282").  The World Fuel Entities

and Irving arranged with the Defendants for the transport of Train 282 from the New Town, North Dakota intermodal transloading facility to Cote Saint-Luc, outside Montreal, Quebec (Canada), *via* the Defendants, and from there the Defendants arranged for transport to Irving's refinery in Saint John, New Brunswick (Canada) *via* MMA's and MMAC's railways. The World Fuel Entities and Irving contracted with the Defendants who in turn subcontracted with MMA for the transport of the Cargo. Defendants were solely responsible for the selection of MMA as a carrier.

30.     The Defendants were the initial, originating, and/or receiving rail carriers.

31.     The Bill of Lading for this shipment was drafted and issued by the Defendants, which was accepted, and identified a World Fuel Entity as the shipper and the party to be billed, and Irving as the consignee. Upon information and belief, the acceptance process for the Bill of Lading was conducted online. Although the online form contained a link titled "general terms and conditions," selecting the link did not lead to a tariff or other document that included liability limitation language, and, in any event, the terms and conditions of CP's tariffs were not incorporated into the Bill of Lading as a matter of law.

32.     The World Fuel Entities were not provided with a copy of the Defendants' rate schedule prior to shipment. The Bill of Lading did not specifically identify a price list or limitation of liability and no such limitation was specifically brought to the World Fuel Entities' attention. The Bill of Lading and any special tariff used for Train 282 failed to include any express limitations on liability and did not incorporate by reference, or otherwise, any limitations on liability and that full Carmack liability pertained to Train 282. The Defendants never indicated to the World Fuel Entities or Irving that any limitation of liability would apply to damages caused by the Defendants during the transport and no opportunity was provided to the

World Fuel Entities to choose between differing levels of liability.  At no time did the World Fuel Entities or Irving agree to any limitation of liability, and full liability under the Carmack Amendment applies to Train 282.

33.    On or about the dates and at the point of origin in New Town, North Dakota, the World Fuel Entities delivered the Cargo to the Defendants in good order and condition, which the Defendants received, accepted, and agreed to transport for certain consideration to the destination, Saint John, New Brunswick (Canada).

34.    The shipping documents identified the entire shipment of the Cargo as a Class 3 flammable liquid having a high flash point -- the temperature at which organic material gives off sufficient vapors to ignite -- and, hence, a low danger.  The Bill of Lading identified the shipment as "Packing Group III", the safest classification in that category.  These representations were incorrect.  On the contrary, tests conducted after the Derailment (defined below) have confirmed that the Cargo had a dangerously low flash point and was highly volatile.  Upon information and belief, CP and Soo Line were aware that this classification was inaccurate or had reasonable cause to believe that the classification was inaccurate and incorrect.

35.    The tank cars provided for transport of the shipment, were all of the same model and design, the so-called DOT-111's.

36.    Defendants knew or should have known that, without reinforced shells, head shields, valves, and other exposed fittings, this type of tank car was prone to rupture upon derailment.  Further, Defendants knew or should have known that unreinforced tank cars were unsafe and unsuitable for the transport of the Cargo.

37.    Upon information and belief, the Defendants, given their extensive dealings with the World Fuel Entities and their access to all forms and other relevant documentation, had

reasonable grounds to suspect that the classification of the crude oil shipment was incorrect; the Defendants had an affirmative duty to not carry the shipment or to stop the shipment until the classification was correct.

38.     The Defendants either conducted no investigation or a faulty investigation to determine the properties of the shipment, did not rectify the improper packaging classification, did not change or improve the tank cars, and did not refuse to transport the shipment.

39.     Thereafter, the Cargo was loaded and, on June 29, 2013, the Defendants obtained possession of the Cargo and rails cars at their point of origin in New Town, North Dakota and began transport of Train 282.

40.     The Defendants transported Train 282 to the Defendants' rail yard in Cote Saint-Luc, Quebec, Canada.   See Canadian Pacific Railway Company's motion to dismiss and memorandum of law in support of motion at 4, Keach v. Canadian Pacific Railway Corp. (In re Montreal Maine & Atlantic Railway Ltd.), No. 14-1001, D.E. 140 (Bankr. D. Me. June 23, 2015 ("CP subsidiaries doing business as Canadian Pacific or Canadian Pacific Railway, conduct U.S. operations, including movement of the train that ultimately derailed from North Dakota to the Canadian border.").  A true and correct copy of this motion is attached hereto as **Exhibit H** and incorporated herein by reference.

41.     At no time did the Defendants stop the transport of the shipment.  Instead, on or about July 5, 2013, the Defendants transferred Train 282 to MMA.

42.     MMA was wholly owned and managed by a company controlled by Edward Burkhardt, who had a reputation in the railway transportation industry for cutting costs and the expense of safety, including disbanding union and union work rules and reducing crew sizes on freight trains from an average 4.8 employees per train to 2.2 employees per train.

11

43. MMA had a train operation safety record worse than the industry average and had prior incidents involving break failure or where the breaks had not been activated resulting in the train rolling away unmanned..

44. Prior to the derailment detailed below, the Defendants knew or should have known that MMA had established a poor safety record in regard to the maintenance and operation of its equipment and tracks.

45. Despite its poor safety record, at all times relevant hereto, MMA operated its trains with a single engineer.

46. The Defendants knew or should have known that MMA operated its trains with a single engineer.

47. MMA was undercapitalized and did not maintain enough insurance to cover potential damage given its poor safety record.

48. The Defendants knew or should have known that MMA was undercapitalized, wasn't adequately solvent, had inadequate insurance coverage, and was otherwise incapable of safely operating Train 282.

49. MMA commenced the second leg of Train 282's transport on July 5, 2013 toward its ultimate destination – Irving's refinery in Saint John, New Brunswick.

50. MMA had no knowledge concerning the actual properties of the Cargo contained in Train 282's DOT-111 tank cars beyond what was contained on the Waybill provided by the Defendants: Petroleum Crude Oil, UN1267, Class 3, Packing Group III, indicating a high flash point and initial boiling point and, hence, a low danger.

51. Shortly before midnight on July 5, 2013, MMA parked and secured Train 282 on its main track near the town of Nantes, Quebec (Canada) and left it unattended. The main track

at this location had a slight descending grade.

52.     On July 6, 2013, Train 282 rolled towards Lac-Mégantic, Quebec where at least 63 of the 72 tank cars derailed, spilling their contents (the "Derailment").

53.     Many, if not all, of the DOT-111 tank cars ruptured upon the Derailment, releasing their contents of crude oil.  The released crude oil ignited upon release, resulting in a number of massive explosions and an accompanying large pool of fire that burned for several days.

54.     Approximately forty-seven people were killed and additional people may have suffered injuries as a result of the explosions and fire.  The town center of Lac-Mégantic sustained extensive damage from the explosions and fire.  The air, soil, and water in and around the site of the Derailment also sustained significant contamination from the spilled crude oil and the resulting fires.

55.     Irving never received delivery of the Cargo as Train 282 and the Cargo never reached its point of destination.

56.     The Derailment precipitated the Bankruptcy Case on August 7, 2013 and ultimate liquidation.  The Chapter 11 Trustee was appointed on August 21, 2013.

57.     As a result of the Derailment, Train 282 and its cargo were completely damaged causing damage and loss to the World Fuel Entities and Irving.  Additionally, the death and destruction arising out of the Derailment spawned numerous claims, suits, and proceedings, including: (a) approximately thirty-nine civil actions commenced by the representatives and administrators of the estate of some of the Derailment victims naming the World Fuel Entities and Irving among defendants originally brought in state court in Illinois and Texas and eventually removed to federal court in Illinois and Texas and transferred to the U.S. District

Court in Maine; (b) a class action petition in which the World Fuel Entities and Irving were named as respondents brought by representatives and administrators of the estates of deceased victims of the Derailment in the Superior Court of the Province of Quebec (Canada); (c) an action by the government of Quebec (Canada) in Orders 628 and 628-A, issued under §114.1 of the provincial Environment Quality Act, c.Q-2, seeking to hold the World Fuel Entities responsible for the costs of cleanup and remediation of the environmental damage caused by the Derailment; and (d) an action brought by the Chapter 11 Trustee against the World Fuel Entities and Irving related to the Derailment. The total amount of damages sought in all of these suits has been estimated to be in excess of a billion dollars creating the potential for massive liability to Irving and the World Fuel Entities.

58.     As a result of these claims, the World Fuel Entities and Irving incurred and would have continued to incur substantial costs and expenses in defending against the claims asserted against them.

59.     Had the Defendants made MMA aware that the Cargo was, in fact, Packing Group I, a hazardous substance, MMA would have implemented certain safety procedures and protocols that would have prevented the Derailment. Among other things, these procedures and protocols would have required that Train 282 never be left unattended, always be parked on a blocked, side track, and never be parked on a main track.

60.     The Defendants owed a duty to the World Fuel Entities, Irving, and MMA to take reasonable measures to avoid or mitigate the dangers associated with the transport of the Cargo and to exercise reasonable care to ensure that Train 282 could be operated in a safe manner to eliminate or reduce the risk of a derailment or minimize the damage that would result in the event of a derailment. Such duties included, but were not limited to: (a) not placing the Cargo

14

for transport until the shipment was properly tested and properly classified; (b) stopping the shipment of the Cargo until it was properly classified; (c) selecting a carrier that had a better safety record, was adequately solvent, capitalized, and insured; (d) ensuring that MMA was informed of the highly dangerous nature of the Cargo by, among other things, ensuring that the Cargo was properly identified, classified, and labelled as a highly flammable liquid so that MMA could implement adequate safety procedures and protocols; and (e) providing safe and appropriate packaging for the Cargo, including providing properly designed and reinforced tank cars that would have prevented or reduced the damages resulting from the Derailment.

61.     Defendants breached those duties, which breaches proximately caused the World Fuel Entities and Irving (and by assignment of these claims, the WD Trustee) to suffer substantial injuries.  These injuries include, but are not limited to: (a) the costs and expenses associated with being named in the numerous suits, actions, and proceedings in various jurisdictions, which arise out of the Derailment and (b) actual or potential liability for the claims made against the World Fuel Entities and Irving.

62.     On or about April 4, 2014, the World Fuel Entities (as holder of the Bill of Lading) sent a notice of claim to the Defendants for all of the damages arising out of the Derailment, including any amounts that the World Fuel Entities might be liable for to injured parties or for environmental clean-up (the "Notice of Claim"), a copy of which is attached hereto as **Exhibit I**.  The Notice of Claim did not specify an amount other than the then known damages totaling at least $6,670,593.27 for the destroyed rail cars.  The other losses were not fully determined at the time of the Notice of Claim, but all rights to seek them were preserved in the Notice of Claim.  Defendants responded by sending the World Fuel Entities, on April 24, 2014, the Disallowance of Carmack Amendment claims, attached hereto as **Exhibit J**.

63.     On or about February 28, 2015, Irving entered into a settlement agreement with the Chapter 11 Trustee, attached hereto as Exhibit D, whereby Irving paid approximately $60 million to a fund designated for the compensation of victims of the Derailment and agreed to assign to and transfer to the Chapter 11 Trustee and MMAC all rights to claims (including under the Carmack Amendment) Irving may have against certain third parties, including the Defendants, in connection with the Derailment and payment of the settlement amount, which assignment and transfer would be effective upon confirmation of the Chapter 11 Trustee's Plan of Liquidation of MMA.  As mentioned above, the Plan was confirmed.

64.     On or about April 16, 2015, Irving, as consignee, sent a letter of potential claim to the Defendants notifying them that Irving's claims under the Carmack Amendment had been assigned to the Trustee, including its claim to recover the approximate $60 million settlement payment (the "Irving Carmack Demand").  The Irving Carmack Demand is attached hereto as **Exhibit K**.  The Defendants did not reply to the Irving Carmack Demand.

65.     On or about June 8, 2015, the World Fuel Entities entered into a settlement agreement, attached hereto as Exhibit E, with the Chapter 11 Trustee whereby the World Fuel Entities paid $110 million (US) to a fund designated for the compensation of victims of the Derailment and agreed to assign and transfer to the Chapter 11 Trustee and MMAC all rights to claims (including under the Carmack Amendment) the World Fuel Entities may have against certain third parties, including the Defendants, in connection with the Derailment and payment of the settlement amount, which assignment and transfer would be effective upon confirmation of the Chapter 11 Trustee's Plan of Liquidation of MMA.  As mentioned above, the Plan was confirmed.

66.     Pursuant to the Plan, the WD Trust (as defined in the Plan) was established for the

16

benefit of the WD Trust Beneficiaries (as defined in the Plan) and serves as a mechanism for liquidating certain assets for the benefit of the WD Trust Beneficiaries and other persons as provided in the Plan.  On October 9, 2015, the Bankruptcy Court entered the Confirmation Order, which authorized the Chapter 11 Trustee to choose Joe R. Whatley, Jr. to serve as the WD Trustee, and to designate the WD Trust and the WD Trustee to be the assignees of claims arising under the Carmack Amendment, which claims had been assigned to the designee of the Chapter 11 Trustee, MMAC, and the Monitor, under the Settlement Agreement (as defined in the Plan). A copy of the Confirmation Order is attached hereto as Exhibit B.  On November 18, 2015, the Maine District Court entered an Order adopting the Confirmation Order, which is attached hereto as Exhibit C.

67.     The Chapter 11 Trustee, MMAC, and the Monitor executed that certain Assignment Agreement assigning their claims under the Carmack Amendment to the WD Trustee and the WD Trust, which Assignment Agreement is attached hereto as Exhibit F.

## COUNT I

### (Carmack Amendment Claim Pursuant to 49 U.S.C. § 11706)

68.     The WD Trustee restates and reasserts the allegations contained in the preceding paragraphs as if set forth at length herein.

69.     On or about the dates and at the point of origin of the shipment of the Cargo in New Town, North Dakota, the Cargo was delivered to the Defendants in good order and condition, which said Defendants received, accepted, and agreed to transport for certain consideration to Irving's refinery in Saint John, New Brunswick (Canada).

70.     The World Fuel Entities and Irving were the shipper, consignee, or owner of the Cargo.

71.     The Defendants are the rail carriers that issued the Bill of Lading and the initial, originating, and/or receiving rail carriers.

72.     The Defendants transported Train 282 filled with the Cargo, crude oil, in DOT-111 tank cars before the train was transferred to MMA.

73.     The Defendants (a) either conducted no investigation or a faulty investigation to determine the properties of the shipment; (b) did not refuse transportation of the Cargo; and (c) did not stop the transport of the Cargo.

74.     The transportation of the Cargo took place between a place in the United States, New Town, North Dakota, and a place in a foreign country, Saint John, New Brunswick (Canada).

75.     At and after the time Train 282 was transferred to MMA, the Defendants (a) did not inform MMA or any of MMA's train operators about the contents of the Cargo, the misclassification of the Cargo, or the improper use of DOT-111 tank cars; (b) did not correct or rectify the improper classification or use of DOT-111 tank cars; and (c) did not stop the transportation of the Cargo.

76.     After Train 282 was transferred to MMA, the Derailment occurred, the shipment never arrived and the aforesaid Cargo was damaged.  The Derailment also resulted in the loss of lies, damage to property, and environmental damage resulting in numerous claims, suits, and proceedings against Irving and the World Fuel Entities.

77.     The Defendants owed a duty to the World Fuel Entities, Irving, and the public to operate their business in a safe manner and to take reasonable measures to avoid exposing the public to dangers associated with the transport of crude oil.

78.     A party transporting hazardous material for shipment in the United States or

18

Canada has the duty, among others: (a) to properly identify and classify all hazardous materials related to the shipment; (b) to determine which hazard class or classes characterize the hazard(s) associated with the material; (c) to assign each material to a packaging group, if applicable; and (d) to ensure that the hazardous material is transported in appropriate packaging.

79.     Under the regulations applicable to the Canadian Transportation of Dangerous Goods Act in effect as of July 6, 2013 (Transportation of Dangerous Goods Regulations, SOR/DORS/2001-286 ("TDGR")), "[a] carrier who notices an error in classification or has reasonable grounds to suspect an error in classification while the dangerous goods are in transport must advise the consignor and must stop transporting the dangerous goods until the consignor verifies or corrects the classification."   TDGR §2.2(6).  "Classification" means, for dangerous goods, as applicable, the shipping name, the primary class, the compatibility group, the subsidiary class, the UN number, the packing group, and the infection substance category." TDGR § 1.4 (emphasis supplied).

80.     Prudent and safe shipping practices dictate that hazardous flammable liquids that are explosive and capable of self-igniting at low ambient temperatures should not be transported in a train including DOT-111 tank cars that do not have reinforced shells, heads shields, valves, and other exposed fittings, unless the train operator is able to implement enhanced safety procedures and protocols to prevent or minimize the risk of derailment.

81.     Prudent and safe shipping practice further dictate that the volatility and flammability of hazardous cargo be properly documented and that every party involved in the extraction, loading, transporting, and refining of crude oil properly document and confirm the volatility and flammability of hazardous cargo.

82.     Prudent and safe shipping practices further dictate that every party involved in the

extraction, loading, transporting and refining of highly volatile crude oil insure that enhanced safety procedures and protocols are established and followed to prevent or minimize the risk of derailment.

83.    Prudent and safe shipping practices further dictate that, unless a train's operator is made aware that the train's cargo contains hazardous, flammable liquids that are explosive and capable of self-igniting at low ambient temperatures and is, therefore, able to implement enhanced safety procedures and protocols to prevent or minimize the risk of derailment, such cargo should not be transported in a train including DOT-111 tank cars that do not have reinforced shells, head shields, valves, and other exposed fittings.

84.    In choosing another carrier to transport the Cargo, the Defendants had a duty to choose a carrier that had a good safety record in regard to the maintenance and operation of its equipment and tracks, to choose a carrier that operated its trains with more than a single engineer, to choose a carrier that was adequately solvent, capitalized and insured in the event that substantial damages were required to be paid.

85.    The Defendants breached their duties to the World Fuel Entities, Irving, and the public at large by taking the following actions or inactions, among others:

>    a.   Failing to conduct a proper investigation and analysis of the Cargo despite knowledge that crude oil produced from the Bakken Formation is explosive and can self-ignite at low temperatures;
>
>    b.   Failing to conduct a proper investigation and analysis of the Cargo resulting in the misclassification of the danger posed by its transportation despite knowledge that DOT-111 tank cars were prone to tear or rupture upon a collision and/or derailment, which could potentially spill their cargo;

    c.   Failing to stop the shipment of the Cargo despite knowledge of the Cargo being misclassified as a Packaging Group III low volatility material;

    d.   Failing to select a carrier with an adequate safety record;

    e.   Failing to select a carrier that operated its trains with more than one engineer;

    f.   Failing to select a carrier that was adequately solvent, capitalized and insured; and

    g.   Failing to notify MMA of the dangers associated with the transport of the Cargo, including that the Cargo had been mislabeled and was in the improper tank cars.

86.    The Defendants knew or should have known that their actions or inactions could result in damage including negligent carriage by another carrier, explosion upon derailment resulting in the loss of lives, property damage, and environmental damage.

87.    As a result of the Defendants' misconduct and negligence, the Cargo became damaged, depreciated and rendered unfit for its intended use.

88.    In addition to the Cargo damage, the World Fuel Entities and Irving were the subject of numerous claims, suits, and proceedings as a result of the loss of lives, property damage, and environmental damage.

89.    The Chapter 11 Trustee also brought action against the World Fuel Entities and Irving.

90.    As a result of these claims, suits, and proceedings, the World Fuel Entities and Irving faced potential liability in excess of a billion dollars.

91.    The aforementioned damages were caused during the course of shipment under the Bill of Lading.

92.     Such loss and damage was reasonably foreseeable and was a direct and proximate result of one or more of the above negligent acts and/or omissions of the Defendants.

93.     The World Fuel Entities suffered damages, costs and loss in a sum estimated to be up to or exceeding $110 million (US).

94.     Irving suffered damages, costs and loss in a sum estimated to be up to or exceeding $60 million.

95.     The Defendants are liable to the WD Trustee, as assignee of the rights of the World Fuel Entities and Irvin, under 49 U.S.C. § 11706, for the actual damages, costs, loss or injury arising from the Derailment and damage, costs, and loss to the Cargo, including all damages, costs, and loss incurred by the World Fuel Entities and Irving as a result of that damage and loss.  Without limitation, such damages include all amounts set forth in the Notice of Claim, the Irving Carmack Demand, and all amounts paid pursuant to the settlement agreements attached hereto and incorporated herein.  Such amounts total not less than $176,670,593.27.

WHEREFORE, Joe R. Whatley, Jr., in his capacity as the WD Trustee of the WD Trust, respectfully requests that this Court (i) enter judgment in favor of the WD Trustee for his: (a) Carmack Amendment claim against the Defendants for the value of the actual damages, costs, loss or injury arising from the Derailment and for the damages, costs, loss, or injury to the Cargo in an amount equal to or exceeding $176,670,593.27 and such additional amounts as are proven at trial, and (b) costs of this action to be taxed to the Defendants; and (ii) grant such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), the WD Trustee hereby demands a jury trial on all issues triable by jury.

Dated:  April 12, 2016

**JOE R. WHATLEY, JR., SOLELY IN
HIS CAPACITY AS THE
WD TRUSTEE OF THE WD TRUST**

By his attorneys:

Joseph A. Wetch, Esq.
SERKLAND LAW FIRM, P.C.
10 Roberts Street
P.O. Box 6017
Fargo, ND 58108
Tel: (701) 232-8957
Fax: (201) 237-4049
Email: jwetch@serklandlaw.com

-and-

Robert J. Keach, Esq.
Roma N. Desai, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
Tel: (207) 774-1200
Fax: (207) 774-1127
Email: rkeach@bernsteinshur.com
        rdesai@bernsteinshur.com